202 P.3d 584

**ESTATE OF Roger ROXAS; and The Golden Budha Corporation, a foreign corporation, Plaintiffs–Appellees,**

v.

**Imelda MARCOS, Defendant–Appellant, and Ferdinand Marcos, Defendant.**

**No. 28702.**

Intermediate Court of Appeals of Hawai'i.

Feb. 12, 2009.

Lex R. Smith, (Kobayashi, Sugita & Goda), Honolulu, on the briefs, for Defendant–Appellant.

Ward D. Jones, (Bervar & Jones), Honolulu, Daniel C. Cathcart, (Magaña, Cathcart, McCarthy), on the briefs, for Plaintiffs–Appellees.

FOLEY, Presiding Judge, with LEONARD, J., Concurring Separately; and NAKAMURA, J., Dissenting.

Opinion of the Court by FOLEY, J.

Defendant–Appellant Imelda Marcos (Imelda) appeals from the "Order Granting (1) Plaintiffs' Motion for Extension of Fourth Amended Judgment Filed on September 6, 2001, Filed on May 8, 2007 [and] (2) Plaintiffs' Motion for Extension of Second Amended Judgment Filed on October 18, 1999, Filed on May 8, 2007" (Order) filed on July 24, 2007 in the Circuit Court of the First

Circuit (circuit court).[1] The circuit court extended the expiration dates of the Second Amended Judgment until October 17, 2019 and the Fourth Amended Judgment until September 5, 2021.

On appeal, Imelda argues that the circuit court erred (1) in finding that the Second Amended Judgment and Fourth Amended Judgment (collectively, the Second and Fourth Amended Judgments) constituted original judgments to which extensions could be granted pursuant to Hawaii Revised Statutes (HRS) § 657-5 (Supp.2008) and (2) by granting the Motion for Extension of Second Amended Judgment and the Motion for Fourth Amended Judgment filed by Plaintiffs–Appellees The Estate of Roger Roxas (Roxas Estate) and The Golden Budha Corporation (GBC) (collectively, the Roxas Parties).

## I.

On January 24, 1971, Roger Roxas (Roger), a locksmith and treasure hunter, discovered the legendary "Yamashita Treasure," which had been buried in the Philippines by Japanese troops during World War II. *Roxas v. Marcos*, 89 Hawai'i 91, 100–01, 969 P.2d 1209, 1218–19 (1998).[2] Individuals under the direction of Ferdinand Marcos (Ferdinand) stole part of the Yamashita Treasure in Roger's possession, arrested Roger on May 18, 1971, and subsequently tortured Roger. *Id.* at 102–03, 969 P.2d at 1220–21.

On June 3, 1986, Roger assigned all of his rights to the Yamashita Treasure to GBC, in exchange for a minority holding of non-voting shares. *Id.* at 107, 969 P.2d at 1225.

On February 19, 1988, Roger and GBC filed suit against Ferdinand and Imelda (collectively, the Marcos Parties). *Id.* at 109, 969 P.2d at 1227. Roger sued Ferdinand individually for false imprisonment and battery. *Id.* GBC asserted claims against the Marcos Parties for conversion, constructive trust, and fraudulent conveyance of the stolen treasure. *Id.* On September 29, 1989, Ferdinand died during the litigation, and the parties subsequently stipulated to substitute Imelda as his estate's personal representative. *Id.* at 109 & 111, 969 P.2d at 1227 & 1229. Roger also died during the litigation, and Felix Dacanay (Dacanay) as the personal representative of the Roxas Estate was substituted for Roger as a party plaintiff. *Id.* at 107 & 109, 969 P.2d at 1225 & 1227.

Pursuant to a jury verdict, the circuit court entered a Judgment on August 28, 1996 (the August 28, 1996 Judgment) in favor of Dacanay as Personal Representative of the Roxas Estate and against Ferdinand on the false imprisonment and battery claims and in favor of GBC and against Ferdinand on the conversion claim. *Id.* at 114, 969 P.2d at 1232. The circuit court entered judgment in favor of Imelda and against the Roxas Parties on all claims asserted against her. *Id.*

On October 21, 1996, the circuit court entered an Amended Judgment in favor of Dacanay as Personal Representative of the Roxas Estate and against Imelda as Personal Representative of the Estate of Ferdinand Marcos (Ferdinand's Estate) on the false imprisonment and battery claims, awarding the Roxas Estate $6 million in damages; in favor of GBC and against Imelda as personal representative of Ferdinand's Estate on the conversion claim, awarding GBC over $22 billion for "one storage area" of gold bullion, $1.4 million for a golden Buddha statue and seventeen gold bars, and $18,517,346,893.15 in prejudgment interest; in favor of the Roxas Parties and against Imelda as personal representative of Ferdinand's estate for costs; and in favor of Imelda, in her individual capacity, and against GBC on the conversion, constructive trust, and fraudulent conveyances claims against her. *Id.* at 113–14 & 157, 969 P.2d at 1231–32 & 1275. Imelda appealed from the Amended Judgment, and the Roxas Parties cross-appealed. *Id.* at 99, 969 P.2d at 1217.

On November 17, 1998, the Hawai'i Supreme Court issued *Roxas*, in which it affirmed, reversed, and vacated and remanded portions of the Amended Judgment as follows:

---

1. The Honorable Karen S.S. Ahn presided.

2. A more detailed description of the background facts established at trial is provided in *Roxas*.

[W]e (1) reverse that portion of the circuit court's amended judgment awarding GBC $22,000,000,000.00 for "one storage area" of gold bullion, (2) vacate those portions of the amended judgment (a) entering judgment in favor of the plaintiffs-appellees [the Roxas Parties] and against Imelda, in her capacity *as personal representative of the Marcos Estate,* (b) awarding GBC $1,400,000.00 in damages for conversion of the golden buddha statue and the seventeen gold bars, and (c) entering judgment in favor of Imelda and against the plaintiffs-appellees on GBC's claim for constructive trust, and (3) remand the matter to the circuit court for (a) the entry of judgment against Imelda in her *personal* capacity, to the extent of her interest in the Marcos Estate, on the Roxas Estate's claims of battery and false imprisonment, and GBC's claim of conversion against Ferdinand, (b) a new trial on the value of the converted golden buddha statue and seventeen gold bars, (c) an award of prejudgment interest on the damages awarded as a consequence of the conversion of the golden buddha and seventeen gold bars, commencing from the date corresponding to the value of the gold assigned by the jury, and (d) further proceedings, to the extent necessary, on GBC's equitable claim against Imelda, in her personal capacity, for constructive trust. In all other respects, the circuit court's amended judgment is affirmed.

*Id.* at 157, 969 P.2d at 1275.

On remand, the circuit court entered on October 18, 1999 a Second Amended Judgment, in which the circuit court entered judgment "in favor of [Dacanay] as personal representative of the [Roxas Estate] in the amount of $6 million in general damages for false imprisonment and battery against Imelda Marcos in her personal capacity, to the extent of her interest in the Marcos Estate." The circuit court ordered that "[t]his judgment is entered *nunc pro tunc* as of October 21, 1996" (the date of the Amended Judgment).

On June 26, 2000, the circuit court entered a Third Amended Judgment, in which the court awarded GBC damages and interest for conversion of the golden Buddha statue and seventeen gold bars against Imelda "in her personal capacity, to the extent of her interest in the Marcos Estate." The circuit court ordered that "[t]his Third Amended Judgment is entered *nunc pro tunc* as of October 21, 1996." The circuit court did not certify the judgment for appeal.

On September 6, 2001, the circuit court entered a Fourth Amended Judgment, *nunc pro tunc* as of October 21, 1996, amending the Second Amended Judgment. The circuit court held in favor of GBC and against Imelda "in her personal capacity, to the extent of her interest in the Marcos Estate" on the conversion claim, awarding in excess of $13 million in damages and prejudgment interest. The circuit court also reserved the constructive trust claim against Ferdinand for later action. The Roxas Parties appealed and Imelda cross-appealed from the Fourth Amended Judgment. On November 29, 2005, the Hawai'i Supreme Court issued a Summary Disposition Order in No. 24605, affirming the Fourth Amended Judgment.

On May 8, 2007, the Roxas Parties filed motions, pursuant to HRS § 657–5, to extend the Second and Fourth Amended Judgments for another ten years. On July 24, 2007, the circuit court filed its Order granting the motions and extending the Second and Fourth Amended Judgments. On August 22, 2007, Imelda timely appealed.

## II.

Regarding statutory interpretation, the Hawai'i Supreme Court has stated:

First, the fundamental starting point for statutory interpretation is the language of the statute itself. Second, where the statutory language is plain and unambiguous, our sole duty is to give effect to its plain and obvious meaning. Third, implicit in the task of statutory construction is our foremost obligation to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. Fourth, when there is doubt, doubleness of meaning, or indistinctiveness or uncer-

tainty of an expression used in a statute, an ambiguity exists. And fifth, in construing an ambiguous statute, the meaning of the ambiguous words may be sought by examining the context, with which the ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning.

*Awakuni v. Awana,* 115 Hawai'i 126, 133, 165 P.3d 1027, 1034 (2007) (citation omitted).

*Del Monte Fresh Produce (Hawaii), Inc. v. Fireman's Fund Ins. Co.,* 117 Hawai'i 357, 363, 183 P.3d 734, 740 (2007).

## III.

### A. The circuit court erred in extending the Roxas Parties' Second and Fourth Amended Judgments.

■ HRS § 657–5 provides:

**§ 657–5 Domestic judgments and decrees.** Unless an extension is granted, every judgment and decree of any court of the State shall be presumed to be paid and discharged at the expiration of ten years after the judgment or decree was rendered. No action shall be commenced after the expiration of ten years from the date a judgment or decree was rendered or extended. *No extension of a judgment or decree shall be granted unless the extension is sought within ten years of the date the original judgment or decree was rendered.* A court shall not extend any judgment or decree beyond twenty years from the date of the original judgment or decree. No extension shall be granted without notice and the filing of a non-hearing motion or a hearing motion to extend the life of the judgment or decree.

(Emphasis added.) At issue is the statute's third sentence, which creates a limitation period that commences on the original judgment's entry date.

The term "original judgment" is not defined by statute, but its meaning is plain and unambiguous. In its ordinary use, the word "original" denotes the "beginning of something, ... a primary form or type from which varieties are derived." *Webster's Encyclopedic Unabridged Dictionary of the En-* *glish Language* 1015 (1989). *See Gillan v. Gov't Employees Ins. Co.,* 119 Hawai'i 109, 115, 194 P.3d 1071, 1077 (2008) (if a term is not statutorily defined, the court may resort to legal or other well-accepted dictionaries to determine the ordinary meaning of the term).

■ Thus, in the context of judgments, "original judgment" logically refers to the first judgment rendered by a court. *See Int'l Sav. & Loan Ass'n v. Wiig,* 82 Hawai'i 197, 199, 921 P.2d 117, 119 (1996) ("[P]ursuant to the plain language of HRS § 657–5, the judgment expired on March 8, 1994—ten years after the original judgment [ (the first judgment) ] was rendered."); *Bank of Hawai'i v. Shinn,* 118 Hawai'i 132, 137, 185 P.3d 880, 885 (App.2008) (emphasis added) ("[Shinn] also had notice by virtue of HRS § 657–5 that such judgments could be extended for ten additional years from their *original entry.*"), *aff'd,* 120 Haw. 1, 200 P.3d 370 (Haw.Sup.Ct. 2008).

Where the statutory language is plain and unambiguous, "our sole duty is to give effect to its plain and obvious meaning." *Del Monte,* 117 Hawai'i at 363, 183 P.3d at 740. Accordingly, we hold that the August 28, 1996 Judgment is the "original judgment" for purposes of this case and the limitation period for an extension commenced on its August 28, 1996 entry date.

That the October 21, 1996 Amended Judgment was subsequently reversed in part and vacated and remanded in part by *Roxas* does not affect our holding. The circuit court concluded that *Roxas* "extinguished" the Amended Judgment and the limitation period commenced on the entry dates of the Second and Fourth Amended Judgments, basing these conclusions on *Wiig* and *Borer v. Chapman,* 119 U.S. 587, 7 S.Ct. 342, 30 L.Ed. 532 (1887). Neither case supports the circuit court's conclusions.

*Wiig* addresses the narrow issue of whether a garnishment order can enforce a judgment that has expired, pursuant to the first sentence of HRS § 657–5; whereas, this case addresses the issue of when the limitation period for extending an existing judgment commences, pursuant to the third sentence of HRS § 657–5. *See Wiig,* 82 Hawai'i at 199,

921 P.2d at 119 ("[I]t is uncontroverted that International Savings did not renew or extend its judgment against Wiig before the ten[-]year period had run"; therefore, "all the rights and remedies appurtenant to that judgment terminate[d]."). *Wiig*, therefore, is inapplicable to the present case.

Nevertheless, even if *Wiig* were applicable to the present case, the language on which the circuit court relies fails to advance the proposition that *Roxas* "extinguished" the August 28, 1996 Judgment:

> [T]he existence of a valid judgment is a jurisdictional prerequisite to garnishment relief. But once a judgment is extinguished by a reversal, vacation, or dismissal, garnishment proceedings pertaining to that judgment are precluded. In other words, the garnishment cannot survive in absence of a valid and existing judgment.

*Wiig*, 82 Hawaiʻi at 201, 921 P.2d at 121 (internal quotation marks, citation, and ellipsis omitted). Based on this language, an "extinguished" judgment is one that is no longer "valid and existing." *Id.* The Hawaiʻi Supreme Court in *Roxas* reversed in part and vacated and remanded in part the October 21, 1996 Amended Judgment; however, the court also affirmed the judgment "in all other respects." The Amended Judgment was not extinguished by *Roxas* such that the judgment was no longer "valid and existing."

*Borer* is also distinguishable from this case. Unlike HRS § 657-5, the Minnesota statute at issue in *Borer* enabled the limitation period to commence "from the time the claim is allowed or established." *Borer*, 119 U.S. at 601, 7 S.Ct. 342. Under HRS § 657-5, the time to extend a judgment runs from the date the original judgment was rendered.

Given the fundamental difference in the language of the Hawaiʻi and Minnesota statutes, *Borer* does not aid in the analysis of HRS § 657-5.

## IV.

The "Order Granting (1) Plaintiffs' Motion for Extension of Fourth Amended Judgment Filed on September 6, 2001, Filed on May 8, 2007 [and] (2) Plaintiffs' Motion for Extension of Second Amended Judgment Filed on October 18, 1999, Filed on May 8, 2007" filed on July 24, 2007 in the Circuit Court of the First Circuit is reversed.

Concurring Opinion by LEONARD, J.

I join in Judge Foley's opinion holding that the term "original judgment" in Hawaii Revised Statutes (HRS) § 657-5 (Supp.2007) plainly means and refers to the first judgment rendered in a case. Any other interpretation leads to ambiguity and uncertainty in the application of a statute of limitations intended to set a deadline, a date certain, for the expiration of a judgment, unless an extension is sought before that date. The statute itself is not ambiguous and in no way states or implies that the ten-year cut-off is tolled or extended by appeals, amendments, or post-judgment relief of any kind.[1] The burden of filing a motion within ten years is minimal and the filing ensures the continued viability of a judgment for an additional ten-year period.[2]

I respectfully disagree with the dissent's view that the Hawaiʻi Supreme Court's decision in *Roxas v. Marcos*, 89 Hawaiʻi 91, 969 P.2d 1209 (1998) (*Roxas I*), "effectively extinguished" the original judgment in this case. In my view, the supreme court went to

---

1. An interpretation of HRS § 657-5 allowing the limitations period to re-start with every amendment, or even certain categories of amendments, also runs afoul of the statute's mandate that "[a] court shall not extend any judgment or decree beyond twenty years from the date of the original judgment or decree."

2. Although not directly addressing this issue, prior cases have applied a plain meaning interpretation of HRS § 657-5. *See, e.g., Int'l Savings & Loan Ass'n, Ltd. v. Wiig*, 82 Hawaiʻi 197, 199, 201, 921 P.2d 117, 119, 121 (1996); *Poe v. Hawaiʻi Labor Relations Bd.*, 98 Hawaiʻi 416, 419,

421, 49 P.3d 382, 385, 387 (2002); *Brooks v. Minn*, 73 Haw. 566, 576, 836 P.2d 1081, 1086 (1992). Given the lack of definitive Hawaiʻi case law otherwise interpreting the meaning of the term "original judgment" in HRS § 657-5, the best practice in a case such as this one would have been to file a motion for extension within ten years from the date of the first judgment, while advocating the position that the extension runs from the date of the later judgment or judgments. Appellees offer no explanation for their delay in seeking to extend the judgment or judgments in this case.

great lengths to *avoid* extinguishing the original judgment and to ensure that the judgment in favor of the Estate of Roger Roxas and the Golden Budha Corporation (Plaintiffs) remained enforceable against the assets of the Estate of Ferdinand Marcos (Estate) to the extent that Imelda Marcos (Imelda) had an interest in those assets. *Id.* at 122–27, 969 P.2d at 1240–45. The supreme court used the doctrine of judicial estoppel to preclude the prejudice that might have resulted from extinguishing the original judgment. *Id.* The "general rule" relied on by the dissent—that a party appearing in one capacity is not bound by a judgment in his or her other capacity—was purposefully deviated from in this case. The supreme court expressly bound Imelda in her individual capacity, to the extent of her interest in the Estate, to the judgment originally entered against her in her capacity as the purported representative of the Estate.

In addition, as pointed out by the dissent, the Second, Third, and Fourth Amended Judgments "were entered *nunc pro tunc* as of the date of the pre-appeal Amended Judgment to preserve Plaintiffs' right to post-judgment interest during the period of appeal in *Roxas I.*" In other words, Plaintiffs sought and obtained an earlier effective judgment date for the purpose of enhancing the amount of the judgment debt,[3] but are now seeking relief from that date to extend the time for collecting the judgment debt. Especially in light of the supreme court's exercise of the doctrine of judicial estoppel to prevent Imelda from blowing "hot and cold" during the course of litigation, Plaintiffs should not now be allowed to take a position contrary to, or inconsistent with, their earlier position that they should be allowed to collect post-judgment interest from the earlier judgment date.[4] Clearly, Imelda is prejudiced by the years of additional post-judgment interest.

In addition, this court need not look back to an 1887 decision of the U.S. Supreme Court to interpret the meaning and effect of a *nunc pro tunc* judgment under Hawai'i law.

We can refer to Hawai'i precedent. Citing earlier Hawai'i cases, the Hawai'i Supreme Court has explained:

A *nunc pro tunc* order relates back to the original date of the matter it affects. The term *nunc pro tunc* signifies or means "now for then" or that a thing is done now that shall have the same legal force and effect as if done at the time it ought to have been done. The doctrine seems to apply to delays of the court and not to premature actions of the parties. Where through no fault of the complaining party some act which the court must perform is not done at the time it ought to be done, the court, in the interest of justice, may and should presently do or perform that act as of the date it should have been done.

*Keahole Defense Coalition, Inc. v. Board of Land and Natural Resources,* 110 Hawai'i 419, 430, 134 P.3d 585, 596 (2006) (citations and internal quotation marks omitted; format altered). In the case at bar, the *nunc pro tunc* judgments "shall have the same legal force and effect" as if done at the 1996 date specified in those judgments.

Finally, the adoption of the dissent's interpretation of HRS § 657–5 would, arguably, effectively extend the life of any final judgment that is amended before, by, or after an appeal, no matter how significant or insignificant an amendment might be. This result would completely eliminate the quality or state of originality from the term original judgment. Absent a change in the legislative mandate that all judgments be deemed extinguished after ten years unless an extension is sought within ten years of the date of the *original* judgment, parties and the courts are best served by the clear, plain understanding that, under HRS § 657–5, the original judgment in any case is the first judgment entered.

## Dissenting Opinion by NAKAMURA, J.

I respectfully dissent. In my view, the Hawai'i Supreme Court's decision in *Roxas*

---

3. Imelda states, and Plaintiffs do not deny, that no supersedeas bond was filed pending appeal and Plaintiffs commenced post-judgment collection actions on January 12, 1997.

4. Indeed, in at least two instances, Plaintiffs themselves referred to an "original judgment" as a judgment altered by an amended judgment.

*v. Marcos,* 89 Hawaiʻi 91, 969 P.2d 1209 (1998) (hereinafter, *"Roxas I"*), effectively extinguished the prior judgments entered by the circuit court by changing the party against whom the monetary awards could be enforced. Prior to *Roxas I,* the judgments had awarded damages against Defendant Ferdinand Marcos (Ferdinand) or Defendant Imelda Marcos (Imelda), as Personal Representative of the Estate of Ferdinand Marcos (Marcos Estate). The Second Amended Judgment, which the circuit court entered in 1999 as directed by the supreme court in *Roxas I,* was the first judgment that was entered against Imelda in her personal capacity.

Consistent with the purpose of Hawaii Revised Statutes (HRS) § 657–5 (Supp.2007)[1] to establish deadlines for the enforcement and extension of judgments, I would construe the term "original judgment" as used in the statute to mean the first enforceable judgment that has not been vacated or extinguished. The Second Amended Judgment was the first judgment awarding damages in favor of Plaintiff–Appellee the Estate of Roger Roxas (Roxas Estate) and against Imelda in her personal capacity. The Third Amended Judgment, entered in 2000, was the first judgment awarding damages in favor of Plaintiff–Appellee The Golden Budha Corporation (GBC) and against Imelda in her personal capacity. Both these judgments did not become enforceable until the circuit court satisfied the certification requirements of Hawaiʻi Rules of Civil Procedure (HRCP) Rule 54(b)[2] by expressly determining that there was "no just reason for delay" and directing the entry of judgment, which the circuit court accomplished by entering the Fourth Amended Judgment in 2001. I therefore conclude that the motions of the Roxas Estate and GBC (collectively, the "Plaintiffs") to extend the Second and Fourth Amended Judgments, which were filed in 2007, were timely filed within the ten-year deadline set forth in HRS § 657–5.

## I.

## A.

This case involves a series of judgments entered before and after the appeal in *Roxas I.* On August 28, 1996, the circuit court entered a Judgment pursuant to the special verdict returned by the jury on July 19, 1996. The August 28, 1996, Judgment entered judgment: 1) in favor of the Roxas Estate and *"against Defendant Ferdinand Marcos"* in the amount of $6,000,000 in general damages for false imprisonment and battery; and 2) in favor of GBC and *"against Defendant Ferdinand Marcos"* in the amount of $22,001,405,000 for conversion. The August 28, 1996, Judgment also entered judgment in favor of Imelda and against the Roxas Estate and GBC "on all claims asserted against Imelda Marcos herein."

1. HRS § 657–5 (Supp.2007) provides:

   Unless an extension is granted, every judgment and decree of any court of the State shall be presumed to be paid and discharged at the expiration of ten years after the judgment or decree was rendered. No action shall be commenced after the expiration of ten years from the date a judgment or decree was rendered or extended. *No extension of a judgment or decree shall be granted unless the extension is sought within ten years of the date the original judgment or decree was rendered.* A court shall not extend any judgment or decree beyond twenty years from the date of the original judgment or decree. No extension shall be granted without notice and the filing of a non-hearing motion or a hearing motion to extend the life of the judgment or decree.

   (Emphasis added.)

2. HRCP Rule 54(b) provides:

   (b) **Judgment upon multiple claims or involving multiple parties.** When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim, or when multiple parties are involved, *the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment.* In the absence of such determination and direction, any order or other form of decision, however designated, which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, *and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties.*

   (Emphases added.)

On October 21, 1996, the circuit court entered an Amended Judgment. The Amended Judgment modified the August 28, 1996, Judgment by substituting "Defendant Imelda Marcos, as Personal Representative for the Estate of Ferdinand Marcos" in place of "Defendant Ferdinand Marcos" in the separate awards of damages in favor of the Roxas Estate and GBC. The Amended Judgment also added an award of taxable costs of $61,074.54 against "Defendant Imelda Marcos, as Personal Representative for the Estate of Ferdinand Marcos." The Amended Judgment retained the language of the August 28, 1996, Judgment which entered judgment in favor of Imelda on all claims against Imelda. The Amended Judgment also contained the circuit court's HRCP Rule 54(b) certification that there was "no just reason for delay in the entry of final judgment on fewer than all of the claims in Plaintiffs' Complaint" and directed the entry of judgment forthwith.

### B.

Imelda, "in her alleged capacity as personal representative of the Estate ... of former Philippine President Ferdinand E. Marcos," appealed the portion of the Amended Judgment entered in favor of Plaintiffs and against the Marcos Estate. *Roxas I*, 89 Hawai'i at 99, 969 P.2d at 1217. Plaintiffs cross-appealed the portions of the Amended Judgment: 1) entered in favor of Imelda, in her individual capacity; and 2) ordering the Marcos Estate to pay damages for conversion, claiming that the circuit court misinstructed the jury on how to determine the value of the converted gold. *Id.* at 99–100, 969 P.2d at 1217–18.

In *Roxas I*, the Hawai'i Supreme Court held that the circuit court abused its discretion in altering the August 28, 1996, Judgment to designate Imelda as personal repre-

sentative of the Marcos Estate because there was insufficient evidence to show that Imelda had been judicially appointed to be the representative of the Marcos Estate. *Id.* at 117–22, 969 P.2d at 1235–40. The supreme court, however, held that the doctrine of judicial estoppel warranted entry of judgment against Imelda in her personal capacity to the extent of her interest in the Marcos Estate. *Id.* at 122–27, 969 P.2d at 1240–45.

The supreme court concluded that Imelda had engaged in deceptive conduct and misled the circuit court into believing that she was authorized to represent the Marcos Estate. *Id.* In particular, Imelda stipulated to being substituted "for the purpose of defending this litigation as the representative of Defendant Ferdinand Marcos deceased," even though she had not been judicially appointed as the personal representative of the Marcos Estate. *Id.* at 109, 122–27, 969 P.2d at 1227, 1240–45.[3] The supreme court stated:

> By means of her stipulation in this case, Imelda accepted the benefit of maintaining full control over the defense of the Marcos Estate, in which she had a substantial interest. Now that the [Plaintiffs] have prevailed against the estate, Imelda argues that she was without authority to act as she did in proffering and entering into the stipulation. In other words, she now claims that because of *her* wrongful act of holding herself out as a proper party for substitution, the [Plaintiffs] should now be stripped entirely of their judgment.

*Id.* at 124, 969 P.2d at 1242.

The supreme court noted that "no matter how unfair Imelda's actions may be, she nevertheless lacked the legal authority to bind the Marcos Estate," and the supreme court therefore concluded that "the Marcos Estate

---

**3.** The supreme court also noted that Imelda acted as if she was the personal representative of the Marcos Estate during the litigation, including at trial. *Roxas I*, 89 Hawai'i at 122–23, 969 P.2d at 1240–42. Imelda opposed Plaintiffs' motion to substitute Irene Silverman as personal representative of the Marcos Estate after Silverman had been appointed personal representative of the Marcos Estate, with power over its California assets, by the Los Angeles County Superior

Court. *Id.* at 111, 123, 969 P.2d at 1229, 1241. The circuit court relied on Imelda's arguments in denying the motion. *Id.* at 123, 969 P.2d at 1241. Imelda's counsel signed documents in the litigation characterizing Imelda as the "representative" of the Marcos Estate. *Id.* During trial, "Imelda's counsel made continued references to her representative capacity with regard to her deceased spouse and to Ferdinand's status as a defendant in the litigation." *Id.*

was not bound by Imelda's stipulation." *Id.* at 126, 969 P.2d at 1244. However, applying the doctrine of judicial estoppel, the supreme court held that "insofar as Imelda's 'personal interests' are concerned, we hold that she has waived any question as to her own authority and is personally bound by the judgment in this case." *Id.*

The supreme court explained its application of judicial estoppel as follows:

> Due in large part to the circuit court's reliance on Imelda's arguments regarding the propriety of her substitution as a party defendant for Ferdinand, the [Plaintiffs] have obtained a judgment that *cannot be enforced against the Marcos Estate.* Simply "estopping" Imelda from claiming that the estate is not bound, *when in fact the [Plaintiffs] cannot collect their judgment from the estate,* offers the [Plaintiffs] no relief from Imelda's wrongdoing. At the same time, it is clear that Imelda fully defended her interests in the estate by vigorously contesting the merits of the [Plaintiffs'] case against her late husband through the services of the same counsel employed by Ferdinand for the same purpose while he was alive. Therefore, in order to achieve manifest justice consistent with the doctrine of judicial estoppel, the equities of this case require us to hold Imelda personally liable, at least to the extent of her interest in the assets of the Marcos Estate, for the amount of the [Plaintiffs'] judgment against Ferdinand, as that amount has been modified according to this opinion, *see generally infra.*

*Id.* at 126, 969 P.2d at 1244 (emphases added).

The supreme court concluded:

> Accordingly, we vacate the portion of the circuit court's amended judgment entered against "Defendant Imelda Marcos, as Personal Representative of the Estate of Ferdinand Marcos" with respect to the [Plaintiffs'] battery, false imprisonment, and conversion claims and remand for entry of judgment as to those claims against Imelda, in her personal capacity, to the

extent of her interest in the Marcos Estate.

*Id.* at 126–27, 969 P.2d at 1244–45.

The supreme court also addressed other claims raised by the parties on appeal. It ultimately reversed, vacated, and affirmed portions of the Amended Judgment as follows:

> [W]e (1) reverse that portion of the circuit court's amended judgment awarding GBC $22,000,000,000.00 for "one storage area" of gold bullion, (2) vacate those portions of the amended judgment (a) entering judgment in favor of the [Plaintiffs] and against Imelda, in her capacity *as personal representative of the Marcos Estate,* (b) awarding GBC $1,400,000.00 in damages for conversion of the golden [B]uddha statue and the seventeen gold bars, and (c) entering judgment in favor of Imelda and against the [Plaintiffs] on GBC's claim for constructive trust, and (3) remand the matter to the circuit court for (a) the entry of judgment against Imelda in her *personal* capacity, to the extent of her interest in the Marcos Estate, on the Roxas Estate's claims of battery and false imprisonment, and GBC's claim of conversion against Ferdinand, (b) a new trial on the value of the converted golden [B]uddha statue and seventeen gold bars, (c) an award of prejudgment interest on the damages awarded as a consequence of the conversion of the golden [B]uddha and seventeen gold bars, commencing from the date corresponding to the value of the gold assigned by the jury, and (d) further proceedings, to the extent necessary, on GBC's equitable claim against Imelda, in her personal capacity, for constructive trust. In all other respects, the circuit court's amended judgment is affirmed.

*Id.* at 157, 969 P.2d at 1275.

C.

Pursuant to *Roxas I,* the circuit court, on remand, amended the Amended Judgment by entering a Second Amended Judgment on October 18, 1999. The Second Amended Judgment, in relevant part, vacated the Amended Judgment to the extent that it entered judgment in favor of Plaintiffs and against Imelda in her capacity as personal

representative of the Marcos Estate.[4] The Second Amended Judgment also: 1) granted judgment in favor of the Roxas Estate in the amount of $6,000,000 on its false imprisonment and battery claims against Imelda in her personal capacity, to the extent of her interest in the Marcos Estate; and 2) awarded Plaintiffs taxable costs of $61,074.54 against Imelda in her personal capacity, to the extent of her interest in the Marcos Estate. Paragraph 6 of the Second Amended Judgment provided that the circuit court retained jurisdiction over GBC's conversion claims as they relate to the gold Buddha and the 17 gold bars and over GBC's cause of action for constructive trust. The Second Amended Judgment did not contain the certification required under HRCP Rule 54(b) for entry of a final judgment as to fewer than all of the claims or parties.

After a bench trial to determine the relevant price of gold for the. converted gold Buddha and the 17 gold bars, the circuit court entered a Third Amended Judgment on June 26, 2000. The Third Amended Judgment amended Paragraph 6 of the Second Amended Judgment to award damages and interest totaling $13,275,848.37 for conversion in favor of GBC and against Imelda in her personal capacity, to the extent of her interest in the Marcos Estate, for the gold Buddha and the 17 gold bars.[5] The Third Amended Judgment did not contain a HRCP Rule 54(b) certification.

The parties attempted to appeal the Third Amended Judgment, but the Hawai'i Supreme Court dismissed the appeal as premature because the Third Amended Judgment did not meet the certification requirements of HRCP Rule 54(b). The supreme court noted that the Third Amended Judgment did not resolve all of the pending claims and did not contain the express determination of "no just reason for delay" in directing entry of judgment as required for an appealable final judgment under HRCP Rule 54(b). The supreme court also concluded that the Third Amended Judgment was not appealable on

the theory that it amended the Second Amended Judgment that, in turn, amended the Amended Judgment, which did contain a HRCP Rule 54(b) certification:

The June 26, 2000 third amended judgment is not appealable as an amendment to the October 18, 1999 second amended judgment inasmuch as the October 18, 1999 judgment also failed to meet the certification requirements of HRCP Rule 54(b). The October 18, 1999 judgment purported to be an amendment to the October 21, 1996 certified judgment [ [(the Amended Judgment)], but the certification was effective only as to those claims certified as final on October 21, 1996 and not to claims subsequently decided by the October 18, 1999 and June 26, 2000 judgments, even though those judgments were entered *nunc pro tunc* to October 21, 1996.

In response to the supreme court's dismissal, GBC moved to amend the Third Amended Judgment to add the HRCP Rule 54(b) certification. On September 6, 2001, the circuit court entered a Fourth Amended Judgment, which used the same language as the Third Amended Judgment in amending Paragraph 6 of the Second Amended Judgment to award damages for conversion. The Fourth Amended Judgment further amended the Second Amended Judgment by adding a paragraph stating, "The court expressly determines that there is no just reason for delay and expressly directs for the entry of judgment." The Second, Third, and Fourth Amended Judgments were each entered *"nunc pro tunc* as of October 21, 1996." On November 29, 2005, the Hawai'i Supreme Court issued a Summary Disposition Order affirming the Fourth Amended Judgment in *Estate of Roxas v. Marcos,* No. 24605, 109 Hawai'i 83, 123 P.3d 208, 2005 WL 3164686 (Hawai'i November 29, 2005) (*"Roxas II"*).

II.

A.

We apply the following principles in interpreting statutes:

---

**4.** The Second Amended Judgment also reversed or vacated $22,001,400,000 of the $22,001,405,000 awarded in damages to GBC on its conversion claim in the Amended Judgment.

**5.** The Third Amended Judgment continued to provide that the circuit court retained jurisdiction over GBC's cause of action for constructive trust.

[O]ur foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. And we must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose.

When there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute, an ambiguity exists.

In construing an ambiguous statute, the meaning of the ambiguous words may be sought by examining the context, with which the ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning. Moreover, the courts may resort to extrinsic aids in determining legislative intent. One avenue is the use of legislative history as an interpretive tool.

This court may also consider the reason and spirit of the law, and the cause which induced the legislature to enact it to discover its true meaning.

*Lingle v. Hawaii Government Employees Ass'n, AFSCME, Local 152, AFL–CIO,* 107 Hawai'i 178, 183, 111 P.3d 587, 592 (2005) (internal quotation marks, brackets, and ellipses omitted) (quoting *Guth v. Freeland,* 96 Hawai'i 147, 149–50, 28 P.3d 982, 984–85 (2001)). In addition, "a rational, sensible and practicable interpretation of a statute is preferred to one which is unreasonable or impracticable." *State v. Lobendahn,* 71 Haw. 111, 112, 784 P.2d 872, 873 (1989) (internal quotation marks and brackets omitted). "[T]he legislature is presumed not to intend an absurd result, and legislation will be construed to avoid, if possible, inconsistency, contradiction, and illogicality." *Keliipuleole v. Wilson,* 85 Hawai'i 217, 222, 941 P.2d 300, 305 (1997) (some brackets in original omitted).

A person can appear in an action in more than one legal capacity. *See* Restatement (Second) of Judgments § 36, Comment a (1982). The general rule is that a person appearing in a representative capacity is not thereby affected in his or her individual capacity. *See id.* Thus, "[a] party appearing in one capacity, individual or representative, is not thereby bound by or entitled to the benefits of the rules of res judicata in a subsequent action in which he appears in another capacity." *Id.* at § 36(2).

It is well settled that "[w]here a judgment is vacated or set aside by a valid order or judgment, it is entirely destroyed and the rights of the parties are left as if no such judgment had ever been entered. No further steps can be legally taken to enforce the vacated judgment." *Flieder v. Flieder,* 575 S.W.2d 758, 760 (Mo.Ct.App.1978); *see People v. Eidel,* 319 Ill.App.3d 496, 253 Ill.Dec. 613, 745 N.E.2d 736, 744 (2001); 49 C.J.S. *Judgments* § 357 (2008) (cited in *United States v. De La Mata,* 535 F.3d 1267, 1276–77 (11th Cir.2008)).

### B.

The purpose of HRS § 657–5 is to establish deadlines for the enforcement and extensions of judgments. Construing HRS § 657–5 in a manner consistent with this purpose, I believe there must be a link between the limitations period for an extension and the entry of an enforceable judgment. It would make little sense to run the limitations period for a judgment extension under HRS § 657–5 from the date of a judgment that has been vacated on appeal and can no longer be enforced.

Here, the supreme court's decision in *Roxas I* effectively vacated and extinguished the August 28, 1996, Judgment and the Amended Judgment to the extent that they entered judgment in favor of Plaintiffs and against Ferdinand or the Marcos Estate. Indeed, the supreme court held that Plaintiffs' judgment against the Marcos Estate was unenforceable and uncollectible because Imelda was not the personal representative of the Marcos Estate. The supreme court vacated the portion of the Amended Judgment entered against Imelda as the personal representative of the Marcos Estate and directed the entry of judgment against Imelda in her personal capacity, to the extent of her interest in the Marcos Estate.

The Second Amended Judgment, issued by the circuit court pursuant to *Roxas I,* was

the first judgment that authorized and permitted the Roxas Estate to enforce an award of damages against Imelda in her personal capacity. The Second Amended Judgment did not include an award of damages for conversion in favor of GBC and against Imelda in her personal capacity. After a new trial on remand to determine the proper price of gold for the gold Buddha and the 17 gold bars, the circuit court entered the Third Amended Judgment. The Third Amended Judgment was the first judgment that authorized GBC to enforce a judgment awarding damages on its conversion claim against Imelda in her personal capacity. Neither the Second Amended Judgment nor the Third Amended Judgment, however, contained the certification required by HRCP Rule 54(b) to make a judgment rendered on fewer than all of the claims or parties a final judgment.

In my view, these judgments did not became enforceable until the circuit court satisfied the HRCP Rule 54(b) certification requirements by entering the Fourth Amended Judgment, which added the express determination that there was "no just reason for delay" in directing entry of judgment. *See King v. Wholesale Produce Dealers Ass'n of Hawaii,* 69 Haw. 334, 335, 741 P.2d 721, 722 (1987) (stating that "[t]he [HRCP] Rule 54(b) order makes a judgment final, both for purposes of execution and appeal"); [6] *In re 2003 and 2007 Ala Wai Blvd., City and County of Honolulu,* 85 Hawai'i 398, 411, 944 P.2d 1341, 1354 (App.1997) (concluding that a stipulated judgment and order did not constitute a judgment lien on property because it was not final), *overruled on other grounds by Knauer v. Foote,* 101 Hawai'i 81, 63 P.3d 389 (2003). Until the HRCP Rule 54(b) certification requirements were met, the Second and Third Amended Judgments were "subject to revision at any time" by the circuit court until a judgment adjudicating all claims of the parties was entered. HRCP Rule 54(b). Other courts, under rules that are not materially different from HRCP Rule 54(b), have held

that a judgment entered on fewer than all of the claims or parties is not enforceable unless the certification requirements of their rule have been satisfied. *E.g., Gauthier v. Crosby Marine Serv., Inc.,* 590 F.Supp. 171, 176 (E.D.La.1984) ("A judgment entered in a multiple party and/or multiple claims case prior to the disposition of the entire case is not enforceable unless the requirements of [Fed.R.Civ.P.] Rule 54(b) are followed."); *Fluor Enterprises, Inc. v. Walter Construction, Ltd.,* 141 Wash.App. 761, 172 P.3d 368, 372–73 (2007) (noting the unfairness of allowing a prevailing party to execute on a non-final judgment before the losing party has the opportunity to seek appellate review); *State ex rel. Electrolert Inc. v. Lindeman,* 99 Ohio App.3d 154, 650 N.E.2d 137, 139–40 (1994); *see Redding & Co. v. Russwine Construction Corp.,* 417 F.2d 721, 727 (D.C.Cir. 1969).

The Second Amended Judgment was the "original judgment" under HRS § 657–5 with respect to the Roxas Estate. It was the first judgment (which had not been vacated or extinguished) awarding damages that was enforceable by the Roxas Estate against Imelda in her personal capacity. For the same reason, the Third Amended Judgment was the "original judgment" under HRS § 657–5 with respect to GBC. Both the Second Amended Judgment and the Third Amended Judgment, however, did not become enforceable, and thus were not "rendered" under HRS § 657–5, until September 6, 2001, when the HRCP Rule 54(b) certification requirements were satisfied by virtue of the Fourth Amended Judgment. The Fourth Amended Judgment also replaced the Third Amended Judgement by incorporating all of its terms. Under my analysis, the clock started running on the ten-year period for the Roxas Estate and GBC to seek extensions on their judgments on September 6, 2001. Accordingly, Plaintiffs' motions to extend the Second and Fourth Amended Judgments, which were filed in 2007, were timely, and the circuit court properly granted the motions.

---

6. In *Jenkins v. Cades Schutte Fleming & Wright,* 76 Hawai'i 115, 869 P.2d 1334 (1994), the Hawai'i Supreme Court overruled *King* to the extent that *King* indicated that an HRCP Rule 54(b) certification in an order would make the order appealable. In *Jenkins,* the court held that an order must be reduced to a separate judgment that contains the HRCP Rule 54(b) certification for an appeal to be taken. *Id.* at 119–20, 869 P.2d at 1338–39. *Jenkins* did not disturb the *King* court's comment that a HRCP Rule 54(b) certification "makes a judgment final, both for purposes of execution and appeal."

III.

The entry of the Second, Third, and Fourth Amended Judgments nunc pro tunc as of October 21, 1996, does not affect the dates they were rendered for purposes of measuring the limitations period for extensions under HRS § 657–5. These judgments were entered nunc pro tunc as of the date of the pre-*Roxas I* Amended Judgment to preserve Plaintiffs' right to post-judgment interest during the period of appeal in *Roxas I.*

In *Borer v. Chapman,* 119 U.S. 587, 7 S.Ct. 342, 30 L.Ed. 532 (1887), the United States Supreme Court rejected the claim that the statute of limitations on a judgment ran from the judgment's nunc pro tunc date instead of the date the final judgment was actually entered. *Id.* at 602, 7 S.Ct. 342. The Court concluded that the nunc pro tunc date was not the effective date of the judgment for all purposes, but rather was "a fiction of law," made and considered to be the true date of the judgment only for the purpose of binding the defendant by the obligation of the judgment as of an earlier date. *Id.* The Court reasoned that the statute of limitations cannot "be allowed to commence to run against a right until that right has accrued in a shape to be effectually enforced." *Id.* Accordingly, the Court held that the statute of limitations on the final judgment at issue did not begin to run until the enforceable judgment was actually entered. *Id.*

I find the reasoning of *Borer* persuasive. The entry of the Second, Third, and Fourth Amended Judgments nunc pro tunc as of October 21, 1996, was a "fiction of law" and did not change the date they actually became enforceable, which was September 6, 2001—the date the HRCP Rule 54(b) certification was entered. Thus, September 6, 2001, is the appropriate date to use to measure the limitations period for Plaintiffs' motions for extensions under HRS § 657–5.

IV.

Based on the foregoing analysis, I respectfully dissent.